First case for argument this morning, Case No. 17-1087, Eastern Missouri, Robert Bolden, Sr. et al. v. United States. Thank you. Ms. Merrigan? Good morning, Your Honor. May it please the Court? Jennifer Merrigan for Appellant Robert Bolden. I will be sharing my time this morning with Carl Miccarelli, Counsel for Amicus, the Government of Canada. I have three points that I would like to stress today. Number one, the Court requested its ruling on contested questions of material facts without first holding a hearing. Two, the Court below failed to rule at all on two claims before this Court. And three, Trial Counsel were deficient because they made key decisions in ignorance. Specifically, they passed up an opportunity for the Canadian Government to advocate for their client without first learning what the consulate could offer, and they jettisoned a mental health mitigation case without first learning the results of the testing that they hired an expert to perform. The standard for denying relief without a hearing is to accept the facts in the light most favorable to Mr. Bolden. In this case, Mr. Bolden proffered clear evidence of brain damage that Trial Counsel was unaware of because Counsel failed to contact their expert to obtain his results. Courts have remanded cases and situations just as this, where Counsel ignored evidence of brain damage, and the District Court denied relief without a hearing. United States v. Runyon in the Fourth Circuit, Fields in the Tenth Circuit, and United States v. Sinisterra in this circuit, where Counsel consulted with experts but failed to present any mental health testimony, instead in that case presenting ten lay witnesses, this court remanded because the record did not affirmatively refute the factual assertions upon which Mr. Sinisterra's claim was based. This court found that without a complete record, it could not determine whether Sinisterra was prejudiced by Counsel's alleged failure to investigate and present mitigation evidence, including the testimony of a neuropsychologist, which was presented in 2255. In this case, Mr. Bolden rebutted the strong presumption of reasonableness of Trial Counsel's actions by proffering affidavits from Trial Counsel, not wherein they offered subjective arguments about their deficiency, but wherein they admitted factual failures that show that their failure to present the results from Dr. Gur stemmed from the fact that they, in their words, dropped the ball. They failed to learn of the results from Dr. Gur, and therefore they forewent a very powerful mental health presentation. Counsel, how many mental health experts interviewed him or consulted with him, and break down the categories if you need to, before trial? Yes, Your Honor. So this is an area of fact that really underscores the need for a hearing in this case, because the government has pointed to a number of experts that Trial Counsel requested funding for in 2255, I'm sorry, at trial, which records were unsealed in 2255. And so the government has pointed to these experts to show that Trial Counsel consulted with all of them, when the record is absolutely not clear on that. Trial Counsel did consult with Dr. Smith, whose report this court has in front of it, and Dr. Fusitola. And I am going to answer the question, but I want to say that that expert specifically, the neuropsychologist, Counsel, in its affidavit, says they didn't really understand his report. They didn't understand what he was finding, which is why they were seeking brain damage testing. They consulted with Dr. Fisher, who met with Mr. Bolden. He was a positive prison adjustment and future dangerousness expert. That was his sole focus. They also consulted with Dr. Rabin, although it is unclear as to what Dr. Rabin performed in the case. And then the other experts that the government points to, Dr. Tamara Hershey's was a diabetes expert. And then Dan Crane and Dan McMarty were both guilt phase experts. They were DNA and crime scene experts. And then Karen Teteli was the mitigation investigator in the case. So Dr. Reuben Gurr was a licensed. He his job in the case, his role in the case was to conduct brain imaging. And he did that. He performed those tests on April 26th and May 7th. And yet counsel simply failed to call him to find out those results in 2255. When we contacted Dr. Gurr, he was surprised to learn that Mr. Bolden was on death row because he had found significant brain damage, significantly reduced brain volume. He found that Mr. Bolden's brain is actually two standard deviations below the average human brain size. And in some some areas, three standard deviations. He noted a highly unusual brain structure. So that was all information that should have been at counsel's fingertips, except that they they simply failed to follow up with their expert. OK, how many do you divide them into categories? But can you give me a rough number in different categories? How many they consulted? And we know they consulted. How many they by your view, they consulted and didn't know or, you know. Yes, your honor. So they consulted by my count. They consulted two psychiatrists, although we only know that one of those saw Mr. Bolden. They consulted a future dangerousness expert and then they consulted a neuropsychologist who actually saw Mr. Bolden. And he is the person that in his report said that he saw indications of brain damage. But counsel of those four or five of those four or five, how many included references to aggressive and impulsive behavior? So in their reports, Dr. Smith specifically refers to aggressive and impulsive behavior. Dr. Fusatola does not. He discusses impulsive behavior that went to planning in the moment. And Dr. Gurr also talks about the impulsivity with regards to planning and difficulty in processing information. And all three of them and Dr. Dudley, who we brought on in twenty to fifty five, discuss the fact that the that the brain damage that Mr. Bolden exhibited, the significant brain damage really went to his ability to process and plan in the moment. This is precisely the kind of evidence that the Supreme Court talks about in Williams versus Taylor. When it talks about a violent behavior as a compulsive reaction rather than the product of cold blooded premeditation. And that is why this evidence would have been so important for counsel in this case, because the government repeatedly emphasized two aggravating factors. And those were that the murder was committed for pecuniary gain and that it was committed in order to evade detection. In closing arguments, counsel for the government emphasized these over a dozen times and repeatedly told the jury that because none of the mitigation was was linked to or connected to those, that premeditation and that planning that the jury should disregard it. In fact, counsel should have had in their arsenal evidence that was directly linked to that ability to plan, especially in the moment. In this case, the verdict forms showed that there was one mental health mitigator and that mitigator misstated the evidence. It instructed the jury that Mr. Bolden's mental and emotional disturbances, while not severe, impacted his behavior. Counsel introduced that mitigator because it had failed to follow up with their their expert. Had they followed up with him, they would have known that, in fact, it was severe. In this case, the district court failed in many respects to apply the proper standards analysis. It refers to the brain damage evidence as purported. It refers to any link with Mr. Bolden's behavior as sheer speculation. In fact, it should have credited that those facts as true. Mr. Bolden proffered them in evidence to the court evidence that went unrebutted because the government did not introduce the report of its expert, Dr. Wetzel. In fact, trial counsel never saw that report when it made the unreasonably uninformed decision to forego mitigation of brain damage. In this case, our experts also found significant trauma, which works, they said, synergistically with the brain damage in this case. Additionally, trial counsel failed when it knew that their client was born in Canada, but failed to contact the Canadian government. Counsel admit in affidavits that they knew they had just attended a conference and they knew that it was their responsibility to contact the foreign government when they were representing a foreign national. They obtained Mr. Bolden's birth certificate and then they failed to to contact Canada without ever having learned how Canada could have assisted. And in this case, this was a federal case that had to undergo capital case authorization at the Department of Justice. And the DOJ manuals and United States attorney's manuals located in our appendix all instructs that the government must consider the foreign citizenship status. Canada, in an affidavit that we supplied from the director of the consular of the Canadian consulate at that time, provides that Canada would have intervened and that they have intervened successfully pre-trial in two other cases in the United States. But they weren't given that opportunity. Here, the harm is that a foreign ally was not at the negotiating table. Are you talking assistance at the guilt phase or the penalty phase? Your Honor, I'm actually talking about assistance pre-trial when the Department of Justice was making an executive decision to prosecute this case capitally. I thought that decision triggered the notification requirement. No, Your Honor, when the government arrested Mr. Bolden, they were aware that he was Canadian and several documents from the marshals reflected that he was Canadian. But actually, this claim does not stem from a notification requirement of the Vienna Convention. This claim stems from trial counsel's duties to have availed themselves of the resources that the Canadian government could have offered but failed to do so. This claim additionally was not ruled on by the lower court. It did not rule on either the Strickland deficiency prong or the prejudice prong under this claim. How would we predict whether the Attorney General would have been influenced by anything the Canadians might have... Well, first of all, how do we know what the Canadians would have said? I guess your position there would be they have a... We could predict they would have registered some opposition to capital punishment. But how do we predict whether the Attorney General would have been influenced by that? Well, Your Honor, I think it is a question of a dispute of material facts, and I think it warrants a hearing. We proffered evidence that Canada has been successful at the negotiating table in capital cases, in two highly aggravated capital cases. What did you present regarding this particular case at the relevant moment in time? Yes, Your Honor, we provided an affidavit from the Director of the Consular Services in 2002 when Mr. Bolden was arrested and at the time of his authorization, who stated that he would have sat down at the negotiating table, that he has had success in capital cases previously. And he provided a list of capital cases in the United States and abroad where Canada has successfully negotiated the death penalty off the table. And what did he say his position would have been with respect to Mr. Bolden, who hadn't been in Canada since he was 16 months old? The Canadian government maintains that Mr. Bolden is a Canadian citizen and that he would have the force of their advocacy, Your Honor. And we provided two separate affidavits. But that's not case specific. Well, it is provided in this case that they would provide that for Mr. Bolden, Your Honor. And those affidavits are in our appendix as well. What kind of hearing would you recommend or urge regarding what the Attorney General of the United States would have done? I don't know. I don't understand how we would have a factual proceeding as to whether there's a reasonable probability that the Attorney General would have declined to proceed. Your Honor, we would call witnesses that are involved in the capital case authorization process and that were at that time. We would also present evidence regarding other foreign nationals and cases that have been deauthorized by the federal government or not authorized where they involved foreign intervention. And we would be able to compare the aggravation and circumstances in those cases and the measures taken by those federal governments, by excuse me, by those foreign governments. When you say people who were involved in the authorization process at the time, are you referring to officials of the U.S. Department of Justice? Yes, Your Honor. Officials of the U.S. Department of Justice. I'm also referring to other others involved in the process. So, for example, we would call, use the court subpoena power to call and examine members of the capital case authorization committee. Who are officials of the U.S. Department of Justice. Is that right? That's correct. Or a former at the time. So you would try to compel people from the Justice Department at the time to come forward and give a view about what they would have done if the Canadians had weighed in on the matter? Your Honor, yes. And additionally, we would present evidence from other attorneys that were involved in the cases of other foreign nationals that the United States attorney did not seek death on. I understood you would try to bring in other cases and argue this is analogous, but I'm trying to understand whether you would try to recreate the authorization process in the Bolden case. It sounds like you would try to do that from what you're saying, that you're going to call these former U.S. officials and ask them to hypothesize what they would have done. Your Honor, at this point, are meeting the burden of a reasonable probability of a different outcome. I don't think that it requires that level of what case supports the admissibility of that kind of testimony. In a 2255 hearing, I will need to think about that, Your Honor, and I will respond to that on rebuttal. I would like to cede six minutes of my time to Mr. Miccarelli, who is representing the Government of Canada. Mr. Miccarelli? Yes, thank you, Your Honors. I'm Carl Miccarelli of Debevoise & Plimpton, and I represent the Government of Canada. I want to pick up on what Ms. Merrigan was just talking about, about Canada's participation in the capital review process. There are three reasons, actually, why we believe this could have made a difference. First of all, as Ms. Merrigan already pointed out, the U.S. Attorney's Manual required prosecutors to specifically include a discussion on whether defendants are citizens of foreign countries, and if so, whether the requirements of the Vienna Convention on Consular Relations have been satisfied. That's page AP363 of the appendix. This makes clear that the foreign relations implications of seeking the death penalty are something the Justice Department takes into consideration, and so is the opportunity for foreign consular officials to assist the defendant. If they weren't concerned about that, they wouldn't have asked for that. They wouldn't have made that a mandatory piece of information to include. Second, Canada's own experience demonstrates, as Ms. Merrigan also pointed out, that its participation can factor into a prosecutor's decision. In particular, one good example of this... Counsel, I want to get case-specific. It seems to me, in this situation, the Canadian officials would have had little to say other than we oppose the death penalty. We would have had that to say. We would have... That obviously was not universally successful. Maybe you can point to one or two where it was, but I'll bet those were case-specific. The case where it wasn't successful was a case out of the Texas state court system, the Folder case, where there was... Don't get distracted. I want to know what they would have said, other than we oppose the death penalty, in terms of assistance provided to someone who had not been in Canada since he was an infant. Well, we could have helped bring to bear information about his childhood in Canada, which was a piece of the mitigation case that the government... What's in this evidentiary hearing? What showing has been made regarding the specifics of that? Well, Your Honor, that's a question of strategy for Ms. Merrigan. I mean, obviously, what would be put on... You would have had to provide... Your client would have had to provide the ammunition, so to speak. What did you provide? Yes, Your Honor. We have information about Mr. Bolden's childhood in Canada that trial counsel did not have. Ms. Merrigan was able to get that. When was that information gathered? After 2010, after the conviction and death sentence, only after we learned about Mr. Bolden's conviction and death sentence. We were not aware of this before trial. We were not aware of this case before trial. And just as to the question of whether the U.S. would be concerned about this thing, again, I want to get back to the Folder case. That was the one case where there was an execution in the U.S. despite opposition by Canada. That was a case of the Texas state courts where we didn't learn about it until after the death sentence. And in that case, something really remarkable happened. The Secretary of State, probably the first time in history, wrote to the Texas Board of Pardons and Paroles saying that they should hold off on the execution. Refresh me. I saw it in your briefs, but refresh me. What was the date of that that the Secretary of State wrote to Texas? That was Secretary Albright, but that was not the last. That's a good enough date for me. Now, in this case, I assume the Attorney General himself at this time were dealing with the Attorney General himself's decision in 2003, right? That's right. Okay. And is there any kind of showing? What kind of showing could you make that would have made a difference to the Attorney General in 2003? Oh, I think a couple of things. First of all, President George Bush in the Medellin case wrote a memo to the Attorney General saying that the United States should hold off on executions of Mexican nationals affected by the Avena case until they had an opportunity for review and reconsideration. And that indicates that in those days, too, the United States was concerned about what foreign countries had to think about execution of their nationals. And I'm sorry, I've cut into Ms. Merrigan's rebuttal time. I could wrap up or I could keep talking up to the court, but I think I will cede the rest of my time to Ms. Merrigan for rebuttal. Thank you, Counsel. Mr. Riley. Thank you, Your Honor. May it please the court. My name is Mike Riley. I'm appearing today as an assistant U.S. attorney from the Eastern District of Missouri. I was co-counsel on this case and one of the lawyers who tried the case in 2006, Steve Holzhauser, the lead counsel on the case now in private practice. And collectively, Your Honors, I know this is a huge record and it may appear complicated, but when the court applies the standards that guide 2255 claims, there are multiple straightforward reasons why each claim fails in this case. And, Your Honor, with regard to the mitigation investigation, here we had experienced, exceedingly experienced counsel. We had three and a half years to conduct a large scale mitigation investigation, which the records before us indicate they consulted multiple mental health professionals. The United States presented in this case a powerful aggravation case, and that's relevant just to the weight of the aggravation case, and the defense submitted 32 mitigators to the jury. Counsel did develop and litigate mental health expert. And based on the record at trial, they chose to present evidence through lay witnesses, including a nurse who was a family member of Mr. Bolden. And they also presented evidence that was tailored to meet this extremely powerful mitigation case, which included Mr. Bolden's downward spiral, his positive traits, and his sincere remorse for this heinous crime. None of the alleged errors or proffered evidence would change the overwhelming evidence or the weight of the aggravators in this case that would affect the ultimate weighing process in the case sufficient to justify, which was substantial. The aggravating factors were sufficient to outweigh the mitigating factors to justify a sentence of death consistent with the district court instruction 435 instruction number nine. There was no moving on. There was no Brady violation in terms of the actual. I'm just going to touch on those INS records for a moment. Those are records that were known to Mr. Bolden. They were not material. There's no council before you before you go too far. The district court didn't say anything about them in the order, right? I mean, not a word. Acknowledge the amended 2255, but then didn't say anything at all. Not a word about them, right? I don't believe so. Your honor, I reviewed the order, and I believe that's correct. Your honor. Well, counsel, how can how can how can you talk about any facts if we don't have any facts? Well, they've been they've been placed before the court, your honor, and in the record and what now? Now, wait, hold on. The record on appeal is a record in the district court, right? It's a federal appellate procedure. So tell me what you mean by record. The record would include it is the record of the district court. Your honor that that's absolutely correct. But council council had submitted the records to the court for its consideration. And and my suggestion is in conduct, conducting the noble review. Those those records were part of the record in the case, and the records either contradict the mitigation themes or their cumulative or remote. I'd also say we pointed out a page 81 of our brief that Mr. Bolden vastly overstates what's contained in the record when he states that they would show that Stella Decker left candidate to escape racism, poverty and abuse in any event. Well, let me interrupt you again. Yeah, I realize the general standards de novo. But it seems to me that in this kind of case, what about a limited remand to the district court for them to make some findings of fact on this? Your honor, that that certainly would be a possibility. Your honor. I also believe the court could could make a ruling based on the record before it. And perhaps watch the court didn't address it explicitly in the order. I think it best. It's an implicit ruling. She did consider their claims. I understand. I do not see it in the order. Your honor. But I do think there's still a basis to make a ruling. The other thing I just touched on on that, your honor. Before you go further on that question about the Brady claim, as I understand it, there were no factual findings in this order at all. Right. Because the judge said. There was no need for a hearing that that's correct. The judge the judge said there was no need for a hearing. And based on the on the record before us, your honor, on all the claims, the government stands by that based on the on the totality of the record is outlined in the government's briefing. There was no need for a hearing. So, on the Brady claim, your position would be the court can just look at the materials that were allegedly not disclosed and make a legal determination. Absolutely. That either they were not material or they were available to the defense or one of your other. Absolutely. Your honor. That's that's absolutely correct. Judge Carlton. And what about nobody? Ms. Merrigan didn't argue this Brady claim. You seem to want to argue the Brady claim, but why don't you talk about the brain evidence was the lead argument of the of the appellant here, if you would address why that why that doesn't call for a hearing. Yes, your honor. Absolutely. The judge. Looking at the record as a whole and being guided by the Strickland analysis in this case of did counsel make errors so serious that counsel was not functioning as counsel is guaranteed by the Sixth Amendment. And keeping in mind also, even the best criminal defense attorneys would not defend a particular client the same way here. When we look at the scope of the investigation, we're certainly not confronted with anything akin to some of the cases that we've seen. Wiggins versus Smith or Ron Pilla versus Beard, and we've laid it out in the brief, your honor. But the mitigation investigation in this case experience Capital Council employed an experienced mitigation specialist who worked on 85 death penalty cases and their their pleadings indicate they were fully aware that they needed to develop a history, including Mr. Bolton's medical background, and it's all funneled toward expert testimony. Potentially, the mitigation experts spent 10 months, interviewed 33 witnesses, reviewed 2500 pages of record, and then filed a pleading with the court that said after 10 months and a $30000 something bill with the scope of that investigation that she now understood what she needed to do. And she would need 500 more hours to complete the investigation. So the investigation is massive in its scope and moving toward the actual mental health evidence. It's clear that that council did consult with mental health professionals, including Robert Smith, a PhD and clinical psychologist and certified specialist. And I know for the record, it's cited our brief, but the breadth of the material that's contained at AP 112 to 120 that was reviewed by Dr. Smith is significant. That's the product of this massive mess mitigation investigation by skilled counsel. They also consulted with Dr. Fusatola, a board certified neuropsychologist and assistant professor of neurology at Washington University. And as counsel has conceded, they consulted with John Raven, who's I believe his his affidavit at government's appendix 143 and 144 states that he twice examined Mr. Bolden in 2005. And like Dr. Dudley, Dr. Raven is a psychiatrist. He's a medical doctor and a forensic psychiatrist. So it appears that Mr. Bolden was presented twice to a qualified psychiatrist. So prior to trial, we have him being examined by a clinical psychologist with Dr. Smith, Dr. Fusatola, certified neuropsychologist and Dr. Raven, a psychiatrist. I understand Dr. Gert conducted the PET scans. He was hired by counsel in February of 2006 and conducted an MRI and PET scan in March and April, respectively, in 2006. The pleadings suggest that counsel was fully aware in their pleadings petitioning regarding Dr. Ryan and Dr. Hershey that there could be organic brain damage issues. This was something that they consider. The record before us reflects, however, that counsel made a clear strategic choice. And and what I would also refer the court to, I laid out in the brief itself, the factors that support this appears when we look at it from an objective point of view from Strickland. The record appears that counsel, after having conducted a constitutionally reasonable investigation, that counsel made a strategic choice to go the other way. And the record would indicate that certainly afforded counsel the benefits of presenting the evidence through a family member who counsel pointed out was on her way. An aspiring doctor. She was familiar with depression. She was familiar with diabetes. And incidentally, she testified to the downward spiral. That's very consistent with what was described in Dr. Bolden's or Dr. Smith's report. Her testimony was was significantly similar to that. Was that was that a family member? Who was that witness? It was a family member. Her name was Sandra Stidham, and she was a nurse. And if I may, if you'll indulge me for just a brief moment, her testimony was essentially as far as depression. When it was worse, his medical condition declined. The more depressed he was, the sicker he got. When his depression level was high, then his episodes with diabetes, they were more. It happened more as far as the sugar levels. You know, him being a hyper and hypoglycemic, then passing out, sweating. The drug usage was way worse. His overall appearance and everything was gone down. Not working. Everything was gone down. That's AP 30, 16 and 17. And they also called a former girlfriend or friend of Mr. Bolden, who kind of reinforced or buttressed that he was down in the dumps, depressed and really did not care about anything. So they presented the evidence and it afforded strategic advantages. But what I'd like to do is, again, just just touch on our 924 J letter in the Chandler case. This is an objective assessment. So even though counsel submitted affidavits, there were multiple ways to defend this case. And they certainly chose one of the reasonable paths. And that's the inquiry here. Could they have done it a different way? Perhaps they could have, as the cases indicate. No lawyer may defend the case the same way two times or a different lawyer may defend it differently. And that's laid out in the footnote in Chandler 16 and 17. But if I can touch on this before you go to prejudice, when you say it's an objective question, do you mean reasonableness of counsel's performance is an objective question? Yes, Your Honor. Absolutely. That's that's whether whether counsel made a strategic decision. Isn't that a matter on which factual inquiry is sometimes warranted? Sometimes, perhaps, Your Honor. But I think in view of the overall record in this case, and I know this was something the court considered in Paul and Alan. But the test, the objective test for the performance, as long as counsel would have performed as a competent lawyer, would his or her detailed subjective reasoning is beside the point. And I'd step back and put it at the broader performance in this case where the record indicates counsel chose an alternative path. And if I may, the proffered evidence would not have. For one thing, it would have undercut the significant evidence of remorse that was critical in this case with a nasty crime. And I'm just going to touch on on the predictive weighing analysis just for a moment. It helps us segue into prejudice, which which there's none. But it would have undercut is is Mr. Bolden capable of meaning conversion? He had an outstanding performance in Bible school and he accepts responsibility or he's so brain damaged that he's incapable of meaning conversion. And when we look at the nature of the crime itself, so there's some strategic concerns, there's additional strategic concerns outlined in the in the brief. But when we look at how, how, where would we end up if this evidence was presented or we had a hearing in the exact same place because of the strength of the aggravation case, the nature of the crime, the devastation to the lay family, including what would be, again, if I may pause just briefly to touch on the weight of the case. Ironclad guilt with identification, DNA evidence, a step back after a shot to the jaw that's causing him to drown in his own blood. He steps back and shoots him in the head. Linda lays primary when she testified. One of her her most important things in her life was being a mother and a grandmother. She was deprived of both of those. Cliff Waddy testified. He arrived at the scene. He held Nathan Lay's hand as he was as he was dying. He had he had flashbacks to the smell of Nathan Lay's blood and Tom lay. The father had to walk into the hospital and see his son hooked up on tubes and unresponsive. And so this is from a man who's 38 years old with a remarkable with a criminal history. That's a powerful aggravation case. So when we look at it, the predictive weighing analysis and we look at his Mr. Bolton's functional ability when he committed the crime in terms of his ability to plan the crime. And he made a decision at the time. And that's in the record. It was either kill the guard or shoot the guard or spend the rest of my life in prison. Something to that effect. And then he went back to his residence and took steps to cover up the crime. So we've got we've got evidence of functionality with his the commission of the crime. We have educational records that don't reflect brain damage, but but an average IQ. He did reasonably well in school. There's record evidence of that. Moreover, there's also evidence of his remarkable jail jail Bible correspondence, which the defense presented in their case. And finally, if we look at his additional jail correspondence, review the correspondence, there's nothing that that is indicative of brain damage. And what Mr. Mr. Bolden articulates in his written grievances. So when we look at the predictive weighing analysis, one thing that would have undercut mitigation, it would have opened the door to rebuttal testimony and it would have would have also been Dr. Smith's notes had they started to present this type of evidence. We also would have gotten to the fact that Mr. Bolden, Dr. Smith had some positive findings about Mr. Mr. Bolden, but more significantly, he had some positive findings in terms of his mental abilities in the original report. But more significantly, what we would have gotten into was was that Mr. Bolden sold drugs for a period of four years when he wasn't using drugs. That was in Dr. Smith's notes. And the defense argument, part of the argument that Mr. McGraw, now Judge McGraw, made to the jury was that Robert Bolden was was only a. He was only three percent of his life, was he involved in criminal activity? And it it allowed the defense to limit and make his his conduct appear to be more of an aberration. They would have blown out by four years, the period in which Mr. Bolden sold drugs and greatly expanded his prior criminal activity. So then, in addition to that, we potentially would have gotten to at least potentially another shooting. That was included in the death penalty notices in this case where he shot another man in the face. And in the appendix, I think the sealed government's appendix, I believe it's 169. There is a factual basis. The shotgun was fired first. That's what the young man was shot with. And and then there were shots that were not so loud after that. That's consistent with Mr. Bolden having fired the first shot. Counsel argued that Mr. Bolden had never been involved in violent crime before. That was also part of the argument. So we're for counsel want to present a mitigating case to the jury that here's an individual who's who's never been involved in violent crime. Criminalized prior criminal activity only spans three percent of his life. And then counsel want to touch on develop the downward spiral depression and the confluence of a men's drug usage that caused Mr. Bolden that would explain this heinous crime. That was the chosen path in this case. And frankly, when we look at the findings that the jury made, I disagree with with counsel's characterization. The finding regarding mental health evidence or the impairments that Mr. Bolden had. They did present evidence of that. And the jury didn't find it compelling. What the jury found compelling, where we have findings of eight people finding mitigating circumstances is consistent with what the case that counsel presented, which is evidence of a reasonable performance. And they were they were on the right track in terms of remorse, his diabetes, his is the things that matter to the jury. Those were in his relationship with his children, which they emphasized. But back to prejudice again in the face of in the face of the. The mitigation case strike that in the face of the aggravation case and the evidence of Bolden's level of functioning, this this evidence would not have made any any difference in the predictive weighing analysis. When when we look at the instruction in the case, even even if the evidence may have changed something, which I don't concede it does. None of the alleged errors or profit or proffered evidence would change the overwhelming weight of the aggravating factors. There's there's nothing that would change the ultimate outcome in the weighing process. And Judge Jackson did watch this trial. She she said and she saw the evidence and the aggravating factors were sufficient to outweigh any mitigating factors to justify a sentence of death. Even considering this evidence, Mr. Bolden would still get the death penalty, even if we consider the proffers for all the reasons that we've stated. If I may, your honor, if I may move to the Vienna Convention claim, unless the court has additional questions on that point. With regard to the Vienna Convention claim. As an initial matter, the point is procedurally defaulted, and that's a significant point. It could have been raised on direct appeal, and it was not. Moreover, I know what it sounds like. Counsel may have conceded that that the Vienna Convention claim is is limited to ineffective assistance of counsel, not notification. If I'm not mistaken. But in any council is ineffective assistance of appellate counsel also argued. Or just trial, just the focus seems to be on trial counsel. That's correct, your honor. And the 1st time that I had seen the ineffective assistance of appellate counsel, our position is that the certificate of appeal ability did not cover appellate counsel. And the 1st time I believe we see it, there's a lot of briefing here. But if I'm not mistaken, I think the 1st time we saw it was in the in the reply brief, your honor. But but nonetheless, the claim is procedurally barred. Mr. Bolden could have raised his Vienna Convention on direct appeal, and he did not. Therefore, the court cannot consider the claim unless Mr. Bolden establishes cause for failing to raise the claim on direct appeal. And for cause, Mr. Bolden now claims that his appellate attorney was ineffective for failing to raise the claim on direct appeal. Again, we don't concede that that's within the certificate of appeal ability, but he cannot establish that his appellate counsel was ineffective for failing to raise this claim on direct appeal. Even if he could establish that his appellate counsel failed to raise this on direct appeal, it does not rise to the level of constitutionally infirm representation. That is, he cannot establish that his appellate attorney raised this issue on direct appeal. That if he had, the outcome of the appellate proceedings would have been different, meaning that Bolden would have prevailed on direct appeal. In order for that to happen, Mr. Bolden would have to show that had the Canadian counsel have been informed of his prosecution, they would have been able to provide some level of appreciable assistance in this case that would have affected his conviction and sentence in his favor. They simply would not have been able to provide that assistance. And the fact of the matter is that all the way that Canada insisted may be able to help either doesn't apply here, or in the case of its contact with the Department of Justice and the preauthorization process is purely rank speculation. So let's talk about it. Let me ask you this, counsel, maybe a distraction. In the case as it was tried, how much did the jury, was the jury told about the illegal alien status? Not at all, Your Honor. And that's an interesting point that you raised, Judge, because... Well, that's a strategic point. If that was kept from the jury, that to me has quite a significant impact on why the Canadian background was not probed. Well, that's absolutely right. And that goes to potential damaging evidence. And it goes to the notification claim. It goes to the INS records. Mr. Bolden's status as being here illegally and being deportable is not a factor that favors the defendant when he shoots a fine young bank guard in the head two times. That is, that is, there are potential strategic reasons why the defense who knew Bolden was born in Canada, there are potential reasons why the defense may not have gone into that. Now, and I would like to touch on something for the record. What about the authorization process? That wouldn't have involved any presentation of information to the jury. And Ms. Merrigan says she wants a hearing at which she would call, you know, various people who are involved in supposedly analogous cases involving foreign nationals where the death penalty was not sought after advocacy by foreign governments and apparently would try to summon members of the committee to discuss whether they would have been influenced by concerns of foreign relations, which she says is mentioned in the U.S. attorney's manual. So could you address that whole matter? Yes, Your Honor. First, with regard to the U.S. If I can move into the facts for a moment, Your Honor, I can see that Mr. Bolden wasn't notified or Mr. Bolden did not request consular notification, nor did the government notify him of those rights. But the way Mr. Bolden presented, he did not present as a Canadian citizen. And I also, as we pointed out in our 28-J letter, we were in possession of materials that he had been arrested and striped that had been born in Canada. Those were contained in his education materials. But the case was initially charged at the state level, adopted. It was indicted sometime in November. The crime occurred in October, and the defendant was written into custody. Those are contained in the early docket entries of the case. So he was arrested by local authorities initially. And everything about Mr. Bolden, at least at the initial outset, he presented as an American citizen in terms of his – there was no language barrier. There was no – as far as we could see, he had a domestic background in St. Louis and a criminal history of being through the justice system. But in terms of some of the concerns that you've raised, Your Honor, to address the nature of the evidentiary hearing or the proposed evidentiary hearing, ultimately we take the position this would never have tipped the scales because of Mr. Bolden's exceedingly tenuous connection to Canada. The government of Canada did not succeed in the Fulger case where the connection to Canada was much stronger than it was here. Mr. Bolden, having spent 16 months in Canada, has an extremely tenuous connection. And then the speculative nature of the hearing that counsel proposes would contain the oddity of compelling executive branch officials to testify to what they would have done. Well, it's only odd because you didn't go through the proper notification process that would have triggered that inquiry at the relevant time. So maybe it's an oddity, but could she do it? And is there a reason – is there a potential that Justice Department people would be affected by the Canadian government in a way that the state of Texas would not be? Judge, one thing I point out to this point, the Canadian government has not intervened other than the filing of its brief. And I think the cases, including the Sixth Circuit case that we've cited in our brief, these are matters for the State Department potentially. But again, with Mr. – the VCCR does not impose individual rights. It doesn't rise to the level of a constitutional claim. We've outlined this in our brief. And in terms of the Department of Justice manual, by no means – the notification wasn't made in this case. And the reason is he did not present as a Canadian citizen. Having said that, I don't intend to sound cavalier one bit about the fact that he wasn't notified. But the VCCR does not impose or confer individual rights. And in terms of the Department of Justice manual, the Department of Justice manual does mandate procedures. But again, that does not confer substantive rights. And now we're getting into a situation where we're considering having one branch of the government compel the executive branch to comply with its procedures, which we didn't in this case. But for the reasons that I've stated, and again, at the end of the day, like all the claims in this case, none of these are outcome determinative. This essentially is rank speculation. Mr. Bolden spent his childhood in Canada. The evidence is remote and tenuous. In terms of what Canada could have offered, that might be useful if Mr. Bolden's mother was charged with a murder in terms of her background, but not necessarily Mr. Bolden. None of this would have tipped the scales. And there is no reason in view of Mr. Bolden's background where he essentially presents and acts as an American citizen familiar with the legal system to suspect that the Department of Justice would have changed the recommendation in this case based on the grievous nature of the crime. There was a reference in the briefs to a sister who testified as a mitigating witness. Was that his mother's sister? No, Your Honor. It was another family member. I'd have to look at my notes. It might have been a cousin. Was it a Canadian family member? No, Your Honor. It was a member of the family. Her name was Sandra Still. And she was a family member from St. Louis, and she testified to his childhood, I believe, without looking at my notes, the abusive background. She claimed the background of the Clarks' essentially adopted family was an abusive one, but the INS records reflect differently. But she also testified to evidence of Mr. Bolden's abandonment, that Stella Clark was an alcoholic and a drunk. And she put on evidence of his childhood that was much more significant than— My point is back to what the jury was not told about his background. Did any Canadian citizen testify in the mitigation case? No, Your Honor. Not at all. Was there any reference to his mother being Canadian? No, Your Honor. Not that I recall. And again, Your Honor, our position is, of course, that evidence is remote and tenuous and would never tip the balance in a predictive weighing analysis. The last thing I would touch on is that counsel here, Mr. McGraw, was involved in over 30 state death penalty cases. Mr. Curran is on the Eighth Circuit's Instruction Committee for Death Penalty Cases. He's the first assistant in the public defender's office. These are exceedingly experienced counsel. And I look at their affidavits, and perhaps they owe a duty of loyalty to their client, and they also may be viewing the distorting effects of hindsight. But when we look at the record in this case, it's exceedingly deliberate at every level. These were expert capital counsel with a well-resourced investigation. And with that, unless there are further questions, I'd simply ask the court to affirm and find that there's no basis for relief on any of the claims that Mr. Baldwin has presented. No basis for an evidentiary hearing based on this record or no relief. Very good. Ms. Merrigan for rebuttal. Yes, Your Honor. Thank you. I would like to start with the Brady claim. As this court pointed out, the lower court did not make any findings of fact or even discuss that claim, though it did grant appellant leave to amend and file that claim when we received the records from the government in 2255. Yesterday, the government... Now, before you leave that, so you would say take your facts as alleged, right? And make a decision because this is de novo, right? Your Honor, what I would say is that there should be a remand for a hearing because there's material disputes. No, wait, wait. We're talking about different kinds of hearings. The statute talks about an evidentiary hearing, and I don't want to take your time. I thought this was a clear point that by the statute and by all our cases, we take the facts as alleged is true and then determine if you get an evidentiary hearing, right? Yes, Your Honor. And under 2255B, I do think we're entitled to an evidentiary hearing on this claim. Yeah, but in the absence of the evidentiary hearing, we just assume you're the facts alleged are true on this claim, right? That's correct. Proceed. Yesterday, the government admitted that they did know that he was Canadian and that they had those records in his file. For 10 years of pleadings, the government has maintained they did not know he was Canadian, and the court should consider that when considering the actual possession of these records. Number two, I would like to respond to a few things that counsel discussed with regard to the brain damage. Counsel is correct that Judge McGraw has a lot of experience in capital cases, and that is why he and Kevin Curran both submitted affidavits admitting that they dropped the ball with regards to getting the brain damage information. They both admit that brain damage was their primary strategy in this case, and they didn't have evidence of it, and it was because they failed to call their expert. That is what the evidence bears out. Here, that was deficient because no reasonable trial counsel would spend that kind of funds and energy and time to obtain that kind of testing and then fail to call their expert. That is deficient. Additionally, in this case, Dr. Gurr admits in his affidavit he never heard from trial counsel after that. In this case, the government's argument that counsel strategically put on a nurse, this court should look very skeptically at that. The cousin that he's talking about was a graduate nurse who had been out of school for nine months, according to her testimony. She worked at a veteran's home. She was not a licensed nurse or even a registered nurse, and for Mr. Riley to call her an aspiring doctor is disingenuous. And it is another example of the way that the facts in this case are being interpreted in a light least favorable to Mr. Bolden, and that is not the standard. That is not where we're at. I would also like to clarify that we are raising two claims under the Vienna Convention claim. These relate to constitutional violations that stemmed from the failure to comply with the Vienna Convention. The first is that trial counsel were ineffective. That is not defaulted. And the second, that the government, that there was a procedural due process violation, we alleged cause. We alleged that that was because appellate counsel was ineffective, and we alleged it in our papers below. The Brady claim and the first aspect of the Vienna Convention claim, that trial counsel were ineffective for failing to comply with their duties under the convention. Is there an affidavit from appellate counsel on this question? Your Honor, I believe that there is. Can you check Hemingway? I believe that there is and will. Is this another drop the ball affidavit or what? My colleague is pulling that up for me. I also would like to offer in regards to Judge Loken's question during my opening. Under TUI, there are multiple cases in which evidence obtained pursuant to court order was court-ordered TUI process was presented to 2255 court. And some of those cases are Martin v. United States in the Southern District of West Virginia, Greeno v. United States in the Eastern District of North Carolina. And we'll be glad to provide a 28-J letter with these. Please, please. Additionally, with regards to the mention of Canada at the trial court level, Judge McGraw opened his opening arguments to the jury by saying that Stella Decker was not guilty. So he did insert that Robert and his mother were from Canada into the record. But then they failed to call a single witness to that effect. I thought you said he brought up that the mother was from Canada. And then you said he did insert that Robert was from Canada. That doesn't follow. Yes, Your Honor. Thank you for clarifying that. I'm not clarifying it. I'm asking whether what you just said is incorrect. Yes, Your Honor. Thank you for asking that question. And I'm looking that up right now. What about on this question of whether the committee should have considered his Canadian status and so forth? I still don't understand how we would reconstruct what the government would have done all these years ago. Couldn't the current president just decide if there's some foreign relations problem here and make a decision about whether to grant clemency or something? Why isn't that a better avenue than trying to speculate about what the U.S. government would have done 20-some years ago? Well, Your Honor, the government has two separate processes. And there's a preauthorization process by which its own protocols require it to consider the foreign national status. And then there is a commutation and clemency process, which specifically provides that the petitioner should not be involved in judicial proceedings. So Mr. Bolden presently is raising a claim under that failure to notify Canada and involve them in the pretrial process. Whether or not he involves Canada, and Canada has been very involved in this case, for post-judicial clemency processes remains to be seen because we're not there yet. But it does not do away with the requirement or with what Canada would have done pretrial. And to clarify my earlier point, what Judge McGraw told the jury in opening is that both Stella Decker and Robert Bolden came from Canada to St. Louis. And I see that I am at time. So thank you very much. Very good, counsel. The case has been very thoroughly briefed and well argued, and we will take it under advisement. Please call the next case. Case number 20-2771, Western Missouri, Jill Denise Olson versus Lee Krause Jr.